## A. G. SMITH v. DAVID V. FINDLEY.

1. HOUSEHOLD GOODS — *What Are, What Not.* Household goods mean everything of a permanent nature, (that is, articles of household which are not consumed in their enjoyment,) that are used or purchased or otherwise acquired by a person for his house, but not articles of consumption, as potatoes, bacon, etc., especially where such articles are held for sale or barter.

2. CONTRACT, *for Carriage of Household Goods; Additional Rates.* Where a shipper enters into a special written agreement with a railway company to transport over its road one car-load of household goods and two horses, from Kansas City or the state line to Minneapolis, in this state, at a greatly reduced rate, and the shipper, without the knowledge or consent of the railway company, puts into the car limited quantities of potatoes, bacon, vinegar and salt, a part of which he has for sale and

barter, and the regular rates for the carriage of the potatoes, bacon, etc., are higher than the rates for household goods and horses, the company is entitled to be paid by the shipper, in addition to the contract-price for carrying the household goods and horses, its regular rates for carrying the potatoes, bacon, etc.

*Error from Ottawa District Court.*

IN April, 1880, *A. G. Smith* was the agent of the Union Pacific Railway Company at Minneapolis, in this state. *David V. Findley* had shipped from Bloomington, Indiana, to Minneapolis, *via* the Union Pacific Railway, on April 12, 1880, a car in which there were two horses and some household goods, and also potatoes, bacon, vinegar, and salt. Upon the arrival of the car at Minneapolis, Findley paid $100 freight, $65 of which was for back charges, and $35 for transportation over the Union Pacific Railway from Kansas City, or state line, to Minneapolis. After the payment of this money to Smith, the agent of the railway company, the latter discovered that the company had transported in the car along with the household goods for Findley, potatoes, bacon, vinegar and salt, and thereupon demanded of Findley $11.88 as additional or extra freight, and also held the goods for the same. Findley refused to pay the $11.88, and on April 16, 1880, commenced an action against A. G. Smith before a justice of the peace of Ottawa county, to replevy the goods from Smith, for which extra or additional freight was charged. Judgment was rendered in his favor before the justice, and the defendant appealed to the district court. Upon leave of that court, Findley filed the following petition, court and title omitted:

"Said plaintiff complains of said defendant, and says that plaintiff is entitled to the immediate possession of the following-described goods, and that he is the owner of the said goods, to wit: Thirty bushels of potatoes, of the actual value of $30; 1½ barrels of apple vinegar, at the actual value of $10; one-half barrel of salt, at the actual value of $1.75; 200 pounds of hog meat, of the actual value of $20. Said plaintiff alleges that said defendant wrongfully detained said goods for the space of one day; that said plaintiff was detained at Minneapolis, Kansas, for the space of two days, by reason of not

getting possession of said goods, to his damage in the sum of thirty dollars. Plaintiff therefore demands judgment for the immediate possession of said goods, or in case he cannot get possession, for the value thereof, together with $30 damage, and costs of suit in the case."

Trial at the May Term, 1884, before the court with a jury. The following is the contract between the plaintiff and the Kansas Pacific Railway Company, (Union Pacific Rly. Co.,) which was offered in evidence by plaintiff:

"LIVE STOCK CONTRACT.—Cars, Nos. 4117.; initials, I. & St. L.—STATE LINE STATION, April 11, 1880.—Agreement made between the Kansas Pacific Railway Company, of the first part, and D. V. Findley, of the second part, Witnesseth: That whereas, the said Kansas Pacific Railway Company, as a common carrier, transports live stock only as per annexed tariff, now considering that the said party of the first part will transport for the said party of the second part one car-load of H. H. goods and two horses from State Line station to Minneapolis station at the rate of $35 per car-load, the same being a special rate, lower than the regular rates mentioned in said tariff, the said party of the second part hereby relieves said party of the first part from the liability of a common carrier in the transportation of said stock, and agrees that such liability shall be only that of a private carrier for hire.

"And said party of the second part hereby accepts for such transportation the cars provided by said company and used for shipment of said stock, and hereby assumes all risk of injury which the animals or either of them may receive in consequence of any of them being wild, unruly or weak, or maiming each other or themselves, or in consequence of heat or suffocation or other ill effects of being crowded in the cars, or on account of being injured by the burning of hay, straw, or other material used by the owner for feeding the stock or otherwise, and also all risk of damage which may be sustained by reason of any delay in such transportation, and all risk of the escape of any portion of said stock, or of loss or damage from any other cause or thing not resulting from the willful negligence of the agents of the said party of the first part.

"And the said party of the second part further agrees that he will load and unload said stock at his own risk, and feed, water and attend the same at his own expense and risk, while it is in the stock-yards of the party of the first part awaiting

shipment, and while on the cars, or at feeding or transfer points, or where it may be unloaded for any purpose.

"And it is further agreed that said party of the second part will see that said stock is securely placed in the cars furnished, and that the cars are safely and properly fastened so as to prevent the escape of said stock therefrom. And it is further agreed that in case the said party of the first part shall furnish laborers to assist in loading and unloading said stock, they shall be subject to the orders and deemed the employés of the said party of the second part while so assisting. And for the consideration before mentioned said party of the second part further agrees that as a condition precedent to his right to recover any damages for loss or injury to said stock he will give notice in writing of his claim therefor to some officer of the said party of the first part, or its nearest station agent, before said stock is removed from the place of destination above mentioned, or from the place of delivery of the same to said party, and before such stock is mingled with other stock.

"The evidence that the said party of the second part, after a full understanding hereof, assents to all the conditions of this contract is his signature hereto.

"FRANK C. JACKSON, *Agent for the Company.*
"D. V. FINDLEY, *Shipper.*

"RULES AND REGULATIONS FOR THE TRANSPORTATION OF LIVE STOCK.— Blood animals, or animals deemed especially valuable, will be carried only on special contract, and agents are not allowed to receive and ship such animals until a proper contract is made between the owner or consignor and the general freight agent. Live stock, not especially valuable, will be rated at first-class rates upon the following estimated weights:

One horse, mule, or horned animal................................................................. 2,000 lbs.
Stallions estimated at................................................................. ...................... 4,000 "
Two horses, mules, or horned animals........................................................... 3,500 "
Three horses, mules, or horned animals......................................................... 5,000 "
Each additional animal................................................................................... 1,000 "

"Hogs, sheep, lambs and calves will be estimated at actual weight, but not less than 280 lbs. each, and will be charged first class. One will not be charged less than 75 cents, however short the distance. Tariff rate per car on this shipment from state line to Minneapolis, $60.

"In case damages occur in transporting live stock, for which the company may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed for a stallion, $200; horse, $100; mule, $65; cattle, $50; and other animals, $20. At the above classification the company agrees to take proper care of the animals, and assume the liability, not exceeding the amounts given above, for loss or damage which may occur to them through the fault or negligence of its officers, agents or employés while in transportation over its road. In case, however, the owner or consignor agrees to save the company from liability for loss or damage occurring from any or all of the causes enumerated in the foregoing contract, and also agrees to load, unload, feed, water and attend to the stock himself, a special rate will be given upon ordinary

stock in car-load lots. Persons not accompanying stock on same train, but preceding it, or following after on passenger or freight train, will not be passed on stock contract, but will be charged regular passenger fare; nor will money be refunded, or passes given, for fares thus paid. Agents are not authorized to agree to forward live stock at any specified time."

The following receipt was also offered in evidence by the plaintiff:

"A. O. 13.—No. 130.—MINNEAPOLIS, Ks., STATION, April 13, 1880.—Mr. D. V. Findley, for transportation from ——, to Union Pacific Railway Company, Dr. Manifest. Date, 11. No. 1586. Car No., 4117; initials, I. & St. L. Description of articles: H. H. gds. and 2 horses. Weight, 20,000; rate for—; amount, $35.00. Rel. Consignor, Wabash 28. Freight, $35.00; charges advanced, $65.00; total, $100.00.

"INSTRUCTIONS.—1. This expense bill must be properly filled up. 2. Charges must in all cases be paid in cash on delivery of goods. 3. Claims for overcharge, loss or damage, should be sent to the general freight agent, accompanied by original expense bill, bill of lading, and full particulars.

"Received payment for the company, 18—.

A. G. SMITH, *Agent.*"

The following is the bill made out by the defendant, A. G. Smith, for the freight upon the potatoes, vinegar, salt and bacon shipped by plaintiff to Minneapolis, which freight the plaintiff refused to pay:

"A. O. 13.—MINNEAPOLIS, KANSAS, STATION, 4—13–1880.—No. 130½.—Mr. D. V. Findley, for transportation from S. L., to Union Pacific Railway Company, Dr. Manifest. Date, 4–11. No. 1586. Car No., 4117; initials, I. & St. L. Description of articles—weight: 1 bbl. salt and bacon, 180; 1 bbl. vinegar, 400; ½ bbl. vinegar, 180; 1 bbl. bacon, 216; bulk potatoes, 1,664; total, 2,640. Rate, 45c—$11.88; freight, $11.88; charges advanced, ——; total, $11.88.

"Corrected bill. Consignor, Wabash.

"INSTRUCTIONS.—1. This expense bill must be properly filled up. 2. Charges must in all cases be paid in cash on delivery of goods. 3. Claims for overcharge, loss or damage should be sent to the general freight agent, accompanied by original expense bill, bill of lading, and full particulars.

"Received payment for the company, 18—.

—— ——, *Agent.*"

The jury returned a verdict for plaintiff, and assessed his damages at the sum of $5. They also made the following special findings of fact:

" *Ques. 1:* Was there not in the car in question a quantity of bacon, potatoes, salt and vinegar which, or a part of which, the plaintiff sold or endeavored to sell after his arrival in Minneapolis? *Ans.:* Yes.

" Q. 2. Was not the rate of the railroad company for the transportation of potatoes, bacon, salt and vinegar greater than for the transportation of household goods? A. In this case, no.

" Q. 3. Did not the increased rate of the railroad company upon the salt, potatoes, vinegar and bacon over and above the rate upon household goods amount to $11.88, and did not Findley refuse to pay the same? A. First question, no; second question, yes.

" Q. 4. Was not the defendant Smith the agent of the railroad company, and did he not for the company demand the increased rate, and in making said demand did he not conform to his duties as such agent? A. Yes."

Upon the return of the verdict, the defendant filed its motion to set aside the answers of the jury to questions 2 and 3, which motion was overruled. It next filed its motion for judgment in its favor upon the special questions and answers, which motion was also overruled. Thereupon the defendant filed its motion to vacate and set aside the verdict, which motion was overruled. The court then entered judgment in favor of the plaintiff that at the time of the commencement of the action he was the owner of and entitled to the possession of the property described in his petition, and that he have and recover of the defendant the sum of $5 and his costs in the action. To the ruling and judgment of the court the defendant excepted, and brings the case here.

*J. P. Usher*, for plaintiff in error.

*J. P. Cummins*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: These facts appear to be undisputed: On April 7, 1880, David V. Findley chartered a box car from the Louisville, New Albany & Chicago Railway Company, in which to ship two horses and his household goods from Bloomington, Indiana, to Minneapolis, in this state. He

loaded the car at Bloomington with two horses, some house-hold goods, and the potatoes, bacon, vinegar and salt in con-troversy.  He paid the charges to Greencastle, Indiana, amounting to $23.50, and took a receipt which set forth that the car contained household goods and stock.  On April 8, 1880, he signed a contract with the Indianapolis & St. Louis Railway Company at Greencastle, Indiana, for the shipment of "one car H. H. goods and stock" from Green-castle to East St. Louis, Illinois.  On April 9, 1880, he signed a contract with the Wabash, St. Louis & Pacific Railway Company to forward over its road one car with "the follow-ing freight, to wit, H. H. gds. and stock, from the St. Louis union depot to Kansas City, at the rate of $40 per car."  On April 11, 1880, he entered into a written agreement with the Kansas Pacific Railway Company, (Union Pacific Railway Co.,) to transport over the road of the company "one car-load of H. H. goods and two horses from the state line station to Minneapolis station, at the rate of $35 per car-load, the same being a special rate lower than the regular rates" mentioned in the tariff annexed to the contract.  He arrived with car at Minneapolis on April 12, 1880, after dark.  He removed the horses and household goods on April 13th; he paid the agent of the Union Pacific Railway Co. at Minneapolis $100 for freight, being $65 back charges on the car, and $35 for trans-portation over the Union Pacific Railway from Kansas City, or the state line, to Minneapolis, and being all that was then demanded.  Soon after the agent had collected the $100 freight, he looked into the car transported by the company and discovered potatoes, bacon, vinegar and salt, which he claimed were not household goods, and therefore immediately demanded of Findley $11.88 additional as freight upon the potatoes, bacon, etc.  Findley refused to pay this extra or additional freight; Smith refused to deliver the goods, and thereupon Findley replevied the same.

The rate on household goods from Kansas City to Minne-apolis on the U. P. Railway was 17 cents per 100, and on the

other goods, for which the additional freight was demanded, the rate was 45 cents per 100. It is claimed by the railway company that potatoes, bacon, vinegar and salt are not household goods, and that there was no right on the part of Findley to put them into the car as such, and that having put them into the car without the knowledge of the railway company, he should pay full tariff rates on the same. In support of this claim, it is stated by counsel that—

"To facilitate the settlement of the country, the company has a rate for the transportation of household goods and farming utensils at about one-third of its regular rate; that the motive for giving this reduced rate is to enable persons of limited means to locate themselves in the unsettled part of the state at a moderate expense, with their household effects; and that a very low rate was made by the railway company over its road to influence and promote such settlement."

The questions are: First, whether the potatoes, bacon, vinegar and salt are to be considered household goods; and second, if not, whether the contract executed between Findley and the Union Pacific Railway Co. for the carrying of his household goods and two horses in the car of the Indianapolis & St. Louis Rly. Co. over its road from Kansas City or the state line to Minneapolis, covered the potatoes, bacon, etc. Bouvier defines household goods to mean "everything of a permanent nature, (that is, articles of household which are not consumed in their enjoyment,) that are used or purchased, or otherwise acquired by a person for his house, but not goods in the way of his trade. Plate will pass by this term, but not articles of consumption found in a house, as malt, hops, or victuals." (Vol. 1, p. 758.) Abbott gives a like definition. (Law Dict., vol. 1, p. 575.) Worcester calls the furniture of a house and utensils convenient for a family, "household stuff." The evidence tended to show, and the jury found as a fact, that a part of the bacon, salt and vinegar transported in the car Findley sold, or endeavored to sell, after his arrival in Minneapolis.

Under all the facts of the case, we think that the phrase "household goods" does not include the potatoes, bacon, etc.,

1. Household goods — what are, what not.

replevied. We also think that these articles were not covered by the written contract between Findley and the Union Pacific Rly. Co. The latter company received the car containing the household goods, horses, potatoes, bacon, etc., from a connecting line, and was not bound to examine the contents of the car before transporting it, to ascertain whether it contained other property than that described in the contract. It had the right to rely upon the contract with Findley as to what the car contained. The railway company, within reasonable bounds, has the right to make a rate for the transportation of horses, household goods, and furniture, and also to make a different rate for potatoes, bacon, etc. If other property of Findley was carried in the car from the state line to Minneapolis

2. Contract for carriage of household goods; additional rates.

than the household goods and horses mentioned in the contract, and for the carriage of which the rate of the railway company was higher than its rate for household goods and horses, then clearly the company was entitled to be paid by Findley its rate for carrying such other property. The company also had a lien for its charges for transportation upon such property, and was entitled to retain the same until the charges were paid.

The findings of the jury to question 2 and to a part of question 3 submitted, are not supported by the evidence, and these special findings being important, the verdict and findings ought to have been set aside and a new trial granted.

"Where a jury render a general verdict and make special findings by answering special questions submitted to them, and some of the special findings are not true, and some of the answers given to the special questions are so evasive and unsatisfactory as to lead to the belief that the party against whom the jury rendered their verdict did not have a fair and impartial trial, the verdict and findings should be set aside and a new trial granted." ( *U. P. Rly. Co. v. Fray*, 31 Kas. 739.)

The written contract of April 11, 1880, between Findley and the Kansas Pacific Rly. Co.— now the Union Pacific Rly. Co.—was the sole and only contract between the parties for

the transportation of the household goods and horses described therein. Therefore the testimony of all verbal or written contracts prior to that one ought not only to have been withdrawn from the jury by the court, but, to have prevented misapprehension, it would have been better if the court, having admitted such evidence, had instructed the jury, as prayed for by the railway company, that the various contracts made by Findley with other railroad companies were not binding upon the Union Pacific Rly. Co. As there was no evidence showing, or tending to show, that the agents of the Union Pacific Railway Company, at the state line or elsewhere, knew the contents of the car, other than as described in the written contract, the direction of the trial court that if Findley, with the knowledge or consent of the Union Pacific Rly. Co., put into the car other articles than his horses and household goods, he would be entitled to the contents of the car without paying additional freight, was misleading. Even if Findley ever had a contract for the through carriage of his freight from Bloomington, Indiana, to Minneapolis, Kansas, he waived all of the terms and conditions thereof by subsequently making special written contracts with each of the separate railway companies or distinct carriers between Bloomington and Minneapolis.

The judgment of the district court will be reversed, and the cause remanded for further proceedings.

All the Justices concurring.